Argued March 24; affirmed May 10, 1932

VOGEL ET AL. *v.* KIRSHNER

(10 P. (2d) 1053)

*Sidney Teiser,* of Portland (Teiser & Keller and Wm. K. Teiser, all of Portland, on the brief), for appellant.

*Herbert L. Swett,* of Portland (Dey, Hampson & Nelson, of Portland, on the brief), for respondents.

ROSSMAN, J. Prior to May 2, 1928, the three parties to this suit, together with the father of the defendant, owned all of the shares of stock of the Modish Cloak & Suit Manufacturing Company. The

plaintiff Ben Vogel and the defendant each owned 300 shares; the plaintiff's brother, who is a co-plaintiff, owned 60 shares, and the defendant's father owned a like amount. Thus, the four owned a total of 720 shares, that being the entire capital stock of the corporation. Some days prior to May 2, 1928, the two plaintiffs and the defendant agreed that the two Vogels should sell their shares of stock to the defendant. Since the corporation owned a considerable quantity of merchandise in addition to the machinery and other equipment which constituted its tailoring plant, the parties felt that the consummation of the sale would be facilitated if the merchandise was converted into cash and accounts receivable. Immediately thereafter they proceeded to do so. At about the same time an inventory was taken of all of the assets of the corporation. Opposite each item was set forth its then market value. After most of the merchandise had been sold and the inventory had been completed the parties employed Julius Goldsmith, an accountant, in whom all three reposed confidence, to prepare a statement showing the financial worth of the corporation. The following is a copy of the statement prepared by him:

"Assets:

| | |
|---|---:|
| Accounts Receivable | 46,029.29 |
| Cash in Bank | 2,908.42 |
| Machinery & Fixtures | 5,250.00 |
| Insurance | 92.00 |
| Lipman Dodge | 37.44 |
| Ford car | 100.00 |
| Mdse. Inventory | 5,476.31 |
| Mdse in San Francisco | 128.25 |
| B. Vogel Dodge | 365.00 |
| B. Vogel Mdse. | 2,239.33 |
| Stationery | 185.00 |
| | 62,811.04 |

Liabilities:

| | |
|---|---|
| Accounts Payable | 349.34 |
| B. Vogel | 695.41 |
| Kirshner | 523.51 |
| Surplus Account | 4,307.35 |
| Expenses May 1st | 154.34 |
| | 6,029.95 |
| Estimated Expense | 100.00 |
| | 6,129.95 |

62,811.04
6,129.95

56,681.09''

After Mr. Goldsmith had delivered this statement to the parties they employed an attorney to reduce to writing their agreement. The document prepared by him recited that the Vogels owned 360 shares of stock which the defendant desired to purchase, and then stated:

"Whereas, it has been agreed between the parties hereto that said Hyman Kirshner shall pay to the said Ben Vogel and Leo Vogel for said stock the sum of $3,417.00 plus an amount equal to one-half of the net amount hereafter collected by said corporation on the accounts receivable * * *.

"Now, therefore, this Agreement Witnesseth * * *."

The above item of $3,417.00 was determined in the following manner, according to our understanding of the evidence. The corporation's assets, exclusive of accounts receivable, were of the value of $16,781.75, according to Goldsmith's statement. This document showed liabilities amounting to $6,129.95 which, when deducted from $16,781.75, left $10,651.80 as the net

value of the assets,. exclusive of accounts receivable. One-half of this sum is $5,325.90 which the parties estimated constituted the value of the plaintiffs' part of the assets. While the inventory was being taken the plaintiffs selected merchandise of the value of $2,239.33 which they were willing to accept in lieu of cash. They also agreed to accept in lieu of cash an automobile owned by the corporation of the value of $365. These two sums aggregate $2,604.33. It will be observed from Goldsmith's statement that the corporation owed Ben Vogel $695.41. When the latter sum was deducted from $2,604.33 a net charge against Ben Vogel of $1,-908.92 was revealed. This sum was subtracted from the above mentioned item of $5,325.90, and thus was obtained $3,416.98, only 2 cents less than the figure $3,-417, mentioned in the above paragraph of the contract.

After the attorney had prepared the contract the parties signed it, put it into effect, and the plaintiffs then moved to Los Angeles where they established themselves in business. Some months later an auditor in the employ of their new company called their attention to the fact that the item in Goldsmith's statement under the head of liabilities and entitled "surplus account," amounting to $4,307.35, should not have been considered a liability in the accounting between the stockholders. When the defendant refused to make an adjustment this suit was instituted. The plaintiffs contend that the evidence, with the required degree of cogency, proves (1) that the parties had agreed that the 360 shares of stock which the defendant was purchasing from the plaintiffs should be paid for with an amount of money representing one-half of the value of the assets of the corporation; (2) that the purpose of the inventory, of the action of the parties in con-

verting the merchandise into accounts receivable, and of Goldsmith's statement was to determine that amount; (3) that Goldsmith's entry of the surplus account of $4,307.35 under the head of liabilities caused the parties to make a mutual mistake when they reduced to writing their agreement; and (4) that the above circumstances entitled the plaintiffs to the relief sought by their complaint. The defendant contends (1) that the parties had effected no agreement or understanding prior to the execution of their written contract; (2) that the defendant did not participate in the taking of the inventory; (3) the financial statement was prepared merely for the convenience of the parties so as to afford them a basis for bargaining as to the price which the defendant should pay for the stock; (4) no agreement was reached as to the price to be paid for the stock until they entered the attorney's office and told him to prepare the contract; (5) these circumstances failed to disclose a mutual mistake; and (6) even if the surplus account should have been included among the assets this error would not entitle the plaintiffs to a reformation of the contract.

■ Defendant's counsel at the outset of the trial in the circuit court freely admitted "that none of these men knew anything about bookkeeping." The evidence, in our opinion, indicates that when the parties negotiated the sale of this stock they paid but slight attention to the fact that the assets with which they were concerned were owned by a corporation. Apparently they were entirely unfamiliar with the corporate entity theory and regarded themselves as partners who owned the merchandise, machinery and equipment. It is our opinion that the matter which concerned them was a sale of a one-half interest of these assets rather than a sale of the shares of corporate stock. Without under-

taking to set forth a review of the evidence, all of which we have studied with care, we express our conclusion that the evidence clearly and with the high degree of persuasiveness required to support suits of this character establishes (1) that when the minds of the parties reached the agreement that the defendant should buy the shares of stock owned by the plaintiffs, and before the parties had employed either Goldsmith or the attorney, they effected an agreement whereby the defendant bound himself to pay for the stock an amount of money equal to one-half of the value of the net assets of the corporation; (2) in order to facilitate the transaction they converted as much as possible of the merchandise into cash and accounts receivable; (3) in order to simplify the statement of their agreement in the written contract, which they contemplated they would later have to prepare, they took an inventory (in which we believe the defendant fully participated) and then employed Goldsmith to prepare a financial statement; (4) having received Goldsmith's statement the parties did not abandon the agreement which required the defendant to pay to the plaintiffs an amount equal to one-half of the value of the net assets, but employed an attorney to reduce to writing that agreement, and Goldsmith's statement was used merely for the purpose of assisting them to render more clear and specific the terms of their existing agreement; and (5) Goldsmith's act in inserting under the head of liabilities the item "surplus account" induced the parties to make a mutual mistake whereby the written instrument bound the defendant to pay to the plaintiffs $2,153.67 less than the amount which the parties had contemplated he should pay.

Having taken the above view of the facts, the situation before us is very similar to that disposed of in

*Howard v. Tettelbaum,* 61 Or. 144. (120 P. 373), and since the principles of equity applicable to the situation are fully set forth there the occasion demands no further statement of those principles of jurisprudence. The defendant, however, contends that the error alleged in the complaint does not appear upon the face of the contract and that, hence, equity cannot assist the plaintiffs. He relies especially upon *DeVoin v. DeVoin,* 76 Wis. 66 (44 N. W 839). That, however, was an action for money had and received in which the pleadings of neither party sought a reformation. The portion of the decision upon which the defendant relies, being the part wherein the court stated that a mistake made by the parties in regard to the subject-matter of the agreement as distinguished from one in reducing the agreement to writing does not entitle the plaintiff to relief, was dictum only. In *Slob v. DeMots,* 153 Iowa 411 (133 N. W. 358), where the parties committed an error similar to that mentioned in *DeVoin v. DeVoin,* and similar to that now before us, the court granted reformation. We quote from Pomeroy's Equity Jurisprudence (4th Ed.), § 853:

"In the second case, the mistake may arise after the parties have verbally concluded their agreement, and may occur in reducing that agreement to writing, by erroneously adding, omitting or altering some term; or it may arise in the very process of making the agreement, during the negotiation itself, one or both the parties misconceiving, misunderstanding or even being entirely ignorant of some term or provision; so that, although they appear to have made an agreement, yet in fact their minds never met upon the same matters."

In *Crookston Imp. Co. v. Marshall,* 57 Minn 333 (59 N. W. 294, 47 Am. St. Rep. 612), cited by Mr. Pomeroy as an illustration of the type of mistake described

in the second clause of the above sentence, relief by way of reformation was allowed. It seems to us that the mistake made by the parties before us was of the type described in the first clause taken from Pomeroy. The minds of the parties had fully met in their verbal agreement which required the defendant to pay to the plaintiffs for the stock an amount equal to one-half of the value of the corporation's assets. They never altered that agreement, but took the inventory and employed Goldsmith, as well as the attorney, for the purpose of perfecting the statement of that agreement. When the three individuals attached their signatures to the contract all supposed that the item $3,417 bound the defendant to pay to the plaintiffs one-half of the value of the items enumerated in the inventory, less the charges against the plaintiffs. The error of Goldsmith thwarted a true expression of their agreement just as effectively as if the attorney, who served as their scrivener, had seized upon a wrong word. The error was material, substantial, and was made without any negligence upon the plaintiffs' part. It is our opinion that it entitles the plaintiffs to relief.

■ The defendant contends, however, that after the contract had been signed the plaintiffs became guilty of inequitable conduct. The contract entrusted the collection of the accounts receivable to an attorney and required him to promptly remit one-half of all collections to the plaintiffs. After he had collected a substantial sum he proposed to delay remittance to the plaintiffs until they had adjusted some dispute which had arisen since the parties had signed the contract. The plaintiffs replied to his letter by demanding that he promptly remit in strict compliance with the provisions of the contract. The defendant argues that the plaintiffs' insistence upon strict compliance with the

terms of the contract was inequitable conduct upon their part. We have carefully examined this portion of the evidence but find nothing which would warrant a conclusion that they were guilty of inequitable conduct. This incident arose before the plaintiffs had discovered that the surplus item had been entered by Goldsmith as a liability. The plaintiffs' letters to the attorney clearly indicate that they felt he owed a duty to be impartial, to remit without attaching conditions not expressed in the contract, and that he should not undertake to represent the defendant while acting as collection agent of the accounts. Nor does the evidence prove that the defendant was entitled to the allowances which the attorney's letter demanded.

It follows from the preceding that the decree of the circuit court will be affirmed.

RAND, CAMPBELL and KELLY, JJ., concur.